THE STATE at the Relation and to the Use of
    EDMOND KOELN, Collector of City of St. Louis,
    v. JOHN SCULLIN, Appellant.

### Division One, December 21, 1915.

1. TAXATION: Assessment: District Assessor. The assessment
   of personal property in the city of St. Louis, wherein there are
   ten assessment districts, should be made by the District As-
   sessor, and not by the President of the Board of Assessors.

2. ――――: ――――: Upon Information. The District Assessor
   called at defendant's residence and there left a blank on which
   defendant was required to make return of his personal property
   for taxation, the blank being detached from a stub in the As-
   sessor's book. On the stub the District Assessor made a memo-
   randum of $50,000 for stocks and bonds and $10,000 for other
   personal property, and the book was turned in to the Assessor's
   office. Thereafter the District Assessor and the President of
   the Board of Assessors had a conversation regarding defendant's
   assessment, and the old stub having been destroyed, a new stub
   was made out, upon which defendant's assessment was fixed at
   $500,000, the figures being made by the District Assessor and
   the stub signed by him, the President saying, "I will be respon-
   sible." On the bottom of the stub $1,000,000 was written by
   some undisclosed person in red ink, an attempt being thereby
   made to double the assessment. No attempt was made to
   ascertain if defendant's personal property exceeded the value
   of $60,000 made by the District Assessor, the only evidence on
   the point being that the District Assessor testified that, when he
   was requested to change the assessment to five hundred thou-
   sand dollars and had stated he did not know just exactly what
   property defendant had, the President said defendant was a
   very wealthy man, and the President, who had no personal
   knowledge of what property defendant owned, testified that
   he had in some way obtained a typewritten report from some
   one, he knew not whom, which showed defendant was worth
   nothing less than five hundred thousand dollars. Held, that the
   second assessment was not made upon information furnished
   by the President, nor was it the semblance of an assessment,
   but was invalid, being a bald usurpation of authority on the
   part of the President.

3. ――――: ――――: Doubling. And the doubling of the illegal
   assessment of $500,000 was likewise a bald usurpation of author-
   ity. The doubling of an assessment is not made automatically
   by the law, but must be made by the assessor.

Appeal from St. Louis City Circuit Court.—*Hon. George C. Hitchcock, Judge.*

REVERSED AND REMANDED (*with directions*).

*Boyle & Priest, Blodgett & Rector* and *Douglas W. Robert* for appellant.

(1) The power to make an assessment is vested only in the district assessor. The President of the Board of Assessors has the power neither to make nor raise nor double an assessment. R. S. 1909, secs. 11352, 11353, 11518; City Charter, art. 5, secs. 16, 18; State ex rel. v. Alt, 224 Mo. 493; State ex rel. v. Dillon, 87 Mo. 487; Western Ranches v. Custer Co., 72 Pac. 659; Land Co. v. Custer Co., 72 Pac. 662; Rich Hill Co. v. Neptune, 19 Mo. App. 442. (2) A prima-facie case made does not place upon the defendant the duty of overcoming it by a preponderance of the evidence. Sec. 11487, R. S. 1909; Berger v. Commission Co., 136 Mo. App. 42; Thayer's Cas. Ev., p. 44. (3) Instruction 3, by fixing the amount of the damages, assumes that the purported assessment of $500,000 was doubled as required by law, and the evidence is that the district assessor did not double that assessment. Crow v. Railroad, 212 Mo. 589. (4) No notice having been served, the assessments were void. State v. Cummings, 151 Mo. 49; Mining Co. v. Neptune, 19 Mo. App. 438. (5) Instruction A asked by the defendant and refused should have been given. It submits to the jury the question whether Cook did in fact make and file the assessment for $60,000. (a) The assessment for $60,000 made by the district assessor could not be raised without notice to Scullin. (b) This assessment being final, the power was exhausted for that period of time. State ex rel. v. Spencer, 114 Mo. 574; State ex rel. v. Van Every, 75 Mo. 530; Mining Co. v. Neptune, 19 Mo. App. 438; Relfe v. Ins. Co., 11 Mo. App. 379;

State v. April Fool M. Co., 26 Nev. 87; Oliver v. Cars-
ner, 39 Tex. 396.

*Edw. W. Foristel* and *Frank H. Haskins* for re-
spondent.

(1) It devolved upon defendant to show that the
assessment was irregular and he must show this by a
preponderance of evidence. State ex rel. v. Vogelsang,
183 Mo. 17; State ex rel. v. Fullerton, 143 Mo. 682;
State ex rel. v. Mastin, 103 Mo. 508; State ex rel. v.
Philips, 137 Mo. 259; Ketchum v. Railroad, Fed. Cases
No. 7738.    (2) The memorandum of $60,000 made by
Cook at the time of leaving the notice was not an as-
sessment. State ex rel. v. Cook, 82 Mo. 185; State ex
rel. v. Carr, 178 Mo. 238; Bank v. Jordan, 16 Ore. 113;
State ex rel. v. Cummings, 151 Mo. 49; R. S. 1909, sec.
11352.    (3) Even if it did constitute an assessment it
could be corrected at any time before final entry upon
the tax books and offer to the public for inspection.
People v. Supervisors, 15 Barb. 607.    (4) The assess-
ment was made and doubled by the district assessor.

WOODSON, J.—The respondent instituted this
suit in the circuit court of the city of St. Louis against
the appellant to recover delinquent personal taxes for
the year 1910.

The trial resulted in a judgment in favor of the
former and against the latter for the sum of $32,154.48
taxes and $1607.72, for costs and attorneys' fees. In
due time and proper form the appellant appealed the
cause to this court.

Under the view we take of the case it will be neces-
sary to decide but one of the numerous propositions
presented by this record for determination, and we
will therefore state such of the facts of the case as will
fully develop that proposition.

The main facts of the case about which there is little or no dispute are substantially set forth by the counsel for the respective parties in their statements of the case; which we will largely adopt. Such additional facts as may be necessary for a proper disposition of the case will be added by the court.

Said statement of counsel is substantially as follows:

This is an action by the State of Missouri, at the relation and to the use of Edmond Koeln, Collector of the city of St. Louis, against John Scullin, to collect delinquent personal taxes due for the year 1910. The case was tried before a jury and judgment rendered in favor of plaintiff and against defendant in the sum of $32,154.48, together with costs, which costs included attorney's fee of $1607.72.

Plaintiff introduced in evidence the certified copy of the tax bill filed with the petition and also the contract between the City Collector and his attorney, the said contract showing that the attorney was entitled to five per cent of the amount of the judgment as compensation for his services.

Plaintiff introduced no further evidence. Defendant's evidence showed that in July or August, 1909, Michael Cook, who was District Assessor for the First District of the city of St. Louis, Missouri, being the district in which defendant then resided, called at defendant's residence and there left a blank on which defendant was required to make return of his property for taxation. That blank was attached to a stub in the District Assessor's book. On that stub Cook made a memorandum of $50,000 for bonds and stocks and $10,000 for other personal property. This stub was turned in to the Assessor's office. Defendant made no return for taxation for the year 1910, and had not made a return for eighteen years.

About October, 1909, Christian Brinkop, who was President of the Board of. Assessors, and his son Walter Brinkop, had a conversation with Cook regarding defendant's assessment. According to the deposition of Cook, a new stub was made out in which defendant's assessment was fixed at $500,000 and this was substituted for the old stub and the old stub was destroyed, but by whom is not made clear; by the evidence Brinkop had it the last time it was seen. The figures on the new stub were placed there by Cook in his own handwriting. According to Cook's testimony he fixed the assessment at five hundred thousand dollars at the request of Walter Brinkop, Cook testifying "Walter told me to make out a stub for five hundred thousand dollars," and "Mr. Brinkop said, 'You sign that, Mr. Cook; I will be responsible.' "

I will here state the facts a little more in detail.

The evidence shows that Michael Cook was the District Assessor of the First District of the city of St. Louis, Missouri, in the year 1909. In July of that year he called at the home of the defendant, 5218 South Broadway in the First District, wrote Mr. Scullin's name and address on the blank furnished by the city and left it there. On the stub of this blank he endorsed $50,000 for bonds and stocks and $10,000 for horses, vehicles of all kinds, automobiles, silverware and household goods in general, a total of $60,000. This stub, which was No. 2799, he turned in to the office of the President of the Board of Assessors in October of 1909.

In December, 1909, Christian Brinkop, President of the Board of Assessors, and Walter Brinkop, son and chief deputy of Christian Brinkop, called Cook into the private office, and Walter told Cook in Christian's presence they wanted a new stub made out, and to make one out for $500,000. Christian Brinkop then said, "You sign that, Mr. Cook, I will be responsible."

Thereupon Cook at their suggestion wrote $500,000 on the new stub in lead pencil. This new stub has the number 68788 on the top, and that was scratched out and No. 2799 written in place of it. The figures $500,000 were written by Cook in pencil and at the bottom of the new stub the figures $1,000,000, were written in red ink by someone else. The old stub was then destroyed. Cook did not double the assessment to $1,000,000, and only made the assessment of $500,000 as requested, and this was done at the suggestion of Walter Brinkop in Christian Brinkop's presence. Christian Brinkop testified that "the office" doubled the assessment.

Joseph H. Weber, a clerk in the office of the Assessment of Revenue for the city of St. Louis, answered a *subpoena duces tecum*, and brought with him all of the affidavits made by the district assessors for the collection of 1910. There are ten districts in the city of St. Louis, numbered from 1 to 10. Weber testified he could find only the affidavits of assessors for districts 2 to 10 in the office. He made a thorough search for the affidavit of the assessor for the First District, but was unable to find that, and that was the only one of the ten affidavits which was missing. Weber also had made a search for the original stub on which the $60,000 assessment was made and that could not be found in the office of the Board of Assessors.

Mr. Cook's account of the substitution of the $500,000 stub for the $60,000 stub is as follows:

"Q. After you turned in that stub, what, if anything, occurred with reference to filling out another stub? A. Well, it was just this way: Mr. Brinkop had a private office and the other we called the general office. I was in the general office and the son, Walter Brinkop, was with his father.

(Interruption by objection.)

"Q. Who was Walter Brinkop? A. A son of

Christian Brinkop, President of the Board of Assessors.

"Q. What position did he hold in the office? A. One of the chief clerks. There's two chief clerks. They got a hundred and fifty each. He was one of them.

"Q. He was the chief clerk of the President of the Board of Assessors? A. Well, he was his private clerk in a way, gave orders.

"The Commissioner:    Gave orders from whom, Mr. Cook? A. Mr. Brinkop.

"Q. And to whom? A. To the assessors, clerks and everybody.

(Interruption by objection.)

"Q. Now, will you please relate, Mr. Cook, what occurred on this particular occasion that you started to refer to? A. Well, he said his father wanted to see me in his private office.

"Q. Did you go into the private office? A. Yes, sir.

"Q. Of Mr. Christian Brinkop? Yes, sir.

"Q. About what date was this, Mr. Cook? A. I couldn't say, sir. That was in the fall of the year, at the same time this suit was being brought—before this suit was brought.

"Q. Well, was it before the last day of December of 1909? A. Yes, sir.

"Q. Some time in the month of December, 1909, was it? A. I wouldn't like to swear to that, sir.

"Q. Now, you went into the office of Christian Brinkop. What occurred in that office at that time? A. Walter told me they wanted a new stub made out.

"Q. Did you have a conversation with Christian Brinkop at that time at that place? A. Yes, sir.

"Q. What was the conversation?

(Interruption by objection.)

"Q. Now, go ahead, Mr. Cook, and state what

took place there? A. You mean, what was said to me?

"The Commissioner: What was said to you by Christian Brinkop in regard to this assessment? A. Well, the son did most of the talking.

"Q. Did Walter Brinkop speak to you regarding this assessment against Mr. Scullin in Christian Brinkop's presence? A. Yes, sir.

"Q. Now, Mr. Cook, will you please state what occurred, the conversation between Walter Brinkop, yourself and Christian Brinkop at that time and at that place regarding the assessment of Mr. John Scullin for 1910? A. Well, Walter told me to make out a stub for $500,000.

"Q. Then what occurred, Mr. Cook? A. I did that. Mr. Brinkop said, 'You sign that, Mr. Cook. I will be responsible.'

"Q. Now what did you write on that stub, Mr. Cook? A. '$500,000.'

"Q. Do you recall whether that was in lead pencil or ink? A. Lead pencil.

"Q. Did you put a bracket on that stub? A. No, sir. . . .

"Q. When you went into Mr. Christian Brinkop's private office did you see your original stub? A. No, sir, I saw that before.

"Q. Well, before you went in there did you see your original stub? A. Yes, sir.

"Q. Who had it, Mr. Cook? A. One of the clerks.

"Q. Will you please state his name? A. Mr. Boediker.

"Q. You saw your original stub? A. Yes, sir.

"Q. Was it in the same condition as when you returned it to the office? A. Yes, sir; any more than '90' was written over the '50.'

"Q. $50,000? A. Yes, sir.

"Q. There had been no other change on that stub? A. No.

"Q. Mr. Cook, did you make any other assessment for taxation for the year 1910 against Mr. John Scullin than the stub you returned, $50,000 and $10,000? A. Only what I was requested to make, the $500,000 that I was requested to make.

"Q. Who told you, Mr. Cook, to write the $500,-000 on the stub? A. Walter Brinkop.

"Q. Was Mr. Christian Brinkop present when that was said? A. Yes, sir.

"Q. What did he say? A. He just told me to sign it.

"Q. Who? A. Christian Brinkop. He says, 'You sign it, I will be responsible.' Said I, 'All right.'"

Mr. Christian Brinkop gives this account of the transaction:

"Q. Do you know whether Mr. Cook as assessor of that district had made a return prior to December of 1909, reporting the value of Mr. Scullin's personal property? A. Yes, sir.

"Q. Where had that assessment been filed? A. In the assessor's office.

"Q. In the assessor's office? A. Yes, sir.

"Q. Was your attention called to that after it had been filed? A. To the best of my recollection it was.

"Q. Who called it to your attention? A. I guess myself, personally. I investigated it.

"Q. How did you happen to examine the return for Mr. Scullin's assessment that had been filed by Mr. Cook? A. I examined a great many of them and among them was Mr. Scullin's.

"Q. Have you any distinct recollection as to having examined Mr. Scullin's return? A. Not particularly. Not anything more than examining a great many others.

"Q. You do remember particularly that you examined the return made by Mr. Cook—. A. Yes, sir.

"Q. And on file in your office? A. Yes, sir.

"Q. And do you know what that return was, the amount returned? A. Well, the return that he made was $60,000.

"Q. It was $60,000? A. Yes, sir.

"Q. And your attention was called to that return? A. Yes, sir.

"Q. Who called your attention to the return? A. I say, in looking over so many of them it came to my attention. . . .

"Q. Now, when you found this return made by Mr. Cook assessing Mr. Scullin's property at $60,000, what did you do in respect of it, if anything? A. Well, I just made a memorandum and took it up with Mr. Cook and told him that I thought that was a very small assessment for such a wealthy man like Mr. Scullin who has never made any returns.

"Q. You made a memorandum? A. Yes, sir.

"Q. What sort of a memorandum? A. Just a little memorandum for myself, so that I could speak to Mr. Cook about it.

"Q. Was that a written memorandum? A. That was my own private memorandum.

"Q. I asked was it a written memorandum? A. It was certainly written with lead pencil, yes, sir.

"Q. What has become of that memorandum? A. That went in the waste basket after I talked to Mr. Cook, of course. You might know that. . . .

"Q. You made a memorandum of this particular case? A. Yes, sir.

"Q. Then after you saw Mr. Cook you destroyed that memorandum? A. After I talked it over with Mr. Cook, it wasn't necessary for me to put it in a file any more.

"Q. What became of the original return of Mr. Cook? A. That I don't know anything about.

"Q. Was that thrown into the waste basket also? A. I don't know, sir. I don't know anything about that.

"Q. Where was it when you last saw it? A. In the Assessor's office.

"Q. In whose hands? A. In my hands.

"Q. The last time, then, you saw the original return made by Mr. Cook of the assessment of Mr. Scullin's property, it was in your hands? A. Yes, sir, the original figure.

"Q. And in your private office? A. In the private office, yes, sir.

"Q. What did you do with it? A. I put it back again.

"Q. Put it back again where? A. Back in the file, yes, sir.

"Q. Where did you put it back? A. Back into the file.

"Q. In which file? A. In one of the cases where we had all the different stubs of assessments.

"Q. Who had charge of the files? A. I had, and of course all the clerk's in the Assessor's office.

"Q. Well, did you make any substitute for that? A. Mr. Cook made a substitute.

"Q. Did you direct him to make it? A. I advised him to make it.

"Q. What did you say to him about it? A. I said, 'Mr. Cook, Mr. Scullin is a very wealthy man and I am surprised you have him down for only $60,000.' He said, "Yes, Mr. Binkop, I know, but I don't know just exactly what the man has. I have been serving him with notice for I guess eighteen years and he never has paid any attention to it. I know he is a rich man.' I said, 'Well, I have something to show he is worth nothing less than five hundred thousand

dollars in personal property.' He said, 'Yes, I guess that is right, Mr. Brinkop, but I have no way of telling it.' I said, 'I would advise you, Mr. Cook, to make that $500,000.'

"Q. You told him you had something there to show he was worth $500,000? A. I did.

"Q. What did you have there to show he was worth $500,000? A. I had a report.

"Q. What report? A. A report of the man what he was possessed of. Like you get a report when you sell a man goods.

"Q. Now, what report did you have? A. Well, what report? I got a report of the man.

"Q. Was it in writing? A. It was in printing.

"Q. In printing? A. In typewriting, I really mean.

"Q. In typewriting? A. Yes, sir.

"Q. Who made the report? A. That I forget now, I can't remember.

"Q. What became of the report? A. That was destroyed afterwards.

"Q. Who destroyed that? A. I don't know. I couldn't remember if I destroyed it or whom.

"Q. Was it in your possession? A. It was.

"Q. Why do you think it was destroyed? A. That is the best of my recollection. . . .

"Q. Who made the report to you? A. I don't remember that.

"Q. Who? A. I can't remember that.

"Q. Was it somebody you employed? A. No, sir.

"Q. Was it signed by anybody? A. It was signed by the people that I got it from at the time.

"Q. What people did you get it from? A. I don't remember that.

"Q. Well, was it several people or one person

that you got it from? A. Oh, there was a whole lot of them.

"Q. Was it a stranger who made this report to you or one with whom you were acquainted? A. Yes, he was a stranger to me as far as myself is concerned."

Defendant at the close of the plaintiff's case and the whole case, offered instructions in the nature of a demurrer to the evidence, which the court refused.

The court, at the instance of the respondent, gave to the jury seven instructions, and refused five asked by appellant.

I. No fair-minded, disinterested person can read this record and come to any other conclusion save that

Christian Brinkop and his son Walter, in
Taxation:    fact, made the assessment in controversy,
Assessment.    and that the assessor, Mr. Cook, whose
duty it was to make it, had nothing whatever to do with it except to write down just what Brinkop and his son ordered him to do.

It is also disclosed by this record that Mr. Cook had no knowledge or information of his own as to what property the appellant owned over and above that at which he assessed it, $60,000, or its value, and so stated those facts to Brinkop. Thereupon the latter ordered Mr. Cook to make out a new assessment for the sum of $500,000, and that he Brinkop, would be responsible for it, which, upon that assurance, Mr. Cook made, and thereupon the old assessment or stub was destroyed, but by whom, is not made perfectly clear by the evidence.

There is no merit whatever in the suggestion that Brinkop had investigated what property the appellant owned, that he reported that fact to Mr. Cook and that the latter made the second or $500,000 assessment upon the information furnished by Brinkop.

Both Brinkop and Cook testify that the latter stated to the former the reason why he fixed the first

assessment at $60,000, was because he had no knowledge or information of any other property owned by appellant; and thereupon Brinkop ordered Cook to make the second assessment at $500,000, and stated that some other person whom he could not name reported to him that appellant owned $500,000 worth of property, and for that reason ordered Mr. Cook to make the $500,000 assessment.

Of course, according to this testimony, Brinkop had no personal knowledge of what property Scullin owned. He was acting purely upon hearsay statements, not under oath, and could not name the party who had so informed him of appellant's property; nor does the record anywhere disclose the fact that Brinkop's informant had any such knowledge.

Such conduct and acts on the part of Brinkop and Cook do not arise to even the semblance of an assessment, which will appear from the authorities to be presently cited.

It was simply a bold, bald piece of usurpation of authority on the part of the former, without law or morality to support it.

The assessment should have been made by Cook and not by Brinkop and his son. This is made clear by the following authorities: Sections 11352, 11353 and 11518, Revised Statutes 1909; City Charter of St. Louis, art. 5, secs. 16 and 18; State ex rel. v. Alt, 224 Mo. 493; State ex rel. v. Dillon, 87 Mo. 487; Western Ranches v. Custer County, 28 Mont. 278; Matador Land & Cattle Co. v. Custer County, 28 Mont. 286; Rich Hill Mining Co. v. Neptune, 19 Mo. App. 1. c. 442.

Moreover, the doubling of the illegal $500,000 assessment was also a bold piece of usurpation of authority by Brinkop, and was equally as illegal as was the assessment itself.

The doubling of an assessment is not made automatically by the law, as was done in this case "in the office," but must be made by the assessor. [Sec. 11353, R. S. 1909.]

And this statute further provides that if the assessor shall neglect or refuse to perform that duty, then he "shall be liable in each case to a penalty of fifty dollars," etc.

Under this view of the case we are of the opinion that the second or the $500,000 assessment is an absolute nullity; and that the judgment should be reversed and the cause remanded to the circuit court with directions to dismiss the suit; and it is so ordered. This, however, is without prejudice as to the original assessment made. All concur.